PAUL J. PASCUZZI, State Bar No. 148810
JASON E. RIOS, State Bar No. 190086
THOMAS R. PHINNEY, State Bar No. 159435
FELDERSTEIN FITZGERALD
WILLOUGHBY PASCUZZI & RIOS LLP
500 Capitol Mall, Suite 2250
Sacramento, CA 95814
Telephone: (916) 329-7400
Facsimile: (916) 329-7435
ppascuzzi@ffwplaw.com
jrios@ffwplaw.com
tphinney@ffwplaw.com

Proposed Attorneys for The Roman Catholic Bishop of Santa
Rosa

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SANTA ROSA DIVISION

| | |
|---|---|
| In re:<br><br>THE ROMAN CATHOLIC BISHOP OF SANTA ROSA,<br><br>        Debtor-In-Possession. | CASE NO. 23-10113<br><br>Chapter 11<br><br>Date: March 16, 2023<br>Time: 1:00 p.m.<br>Location: 1300 Clay Street, Ctrm. 215<br>          Oakland, CA<br>          [In person or via Zoom]<br>Judge: Hon. Charles Novack<br><br>Order Shortening Time |

**MOTION FOR ORDER (1) AUTHORIZING CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, OPERATIONAL BANK ACCOUNTS AND RELATED INVESTMENT ACCOUNTS; (2) EXCUSING COMPLIANCE WITH SECTION 345(b); AND (3) AUTHORIZING CONTINUED USE OF CURRENT INVESTMENT POLICY**

## Table of Contents

JURISDICTION .................................................................................................................1

RELIEF REQUESTED ......................................................................................................1

BACKGROUND ................................................................................................................2

PROCEDURAL POSITION OF THIS MOTION ...........................................................3

FACTUAL BACKGROUND FOR RELIEF REQUESTED .........................................3

    Bank Accounts Related to Debtor's Cash Management System .........................4

    Cash Management System ...................................................................................13

    Prepetition Employee Wages and Benefits ........................................................13

    Compelling Reasons to Maintain the Debtor's Cash Management System and
    Accounting Policies and Practices ......................................................................13

LEGAL ARGUMENT ....................................................................................................15

    A.    Maintaining the Debtor's Current Bank Accounts is in the Best Interests of
    the Estate and is Authorized Pursuant to 11 U.S.C. § 105(a) ............................15

    B.    Maintaining the Debtor's Existing Business Forms is in the Best Interests
    of the Estate ........................................................................................................17

    C.    Maintenance of the Debtor's Existing Cash Management System is in the
    Best Interests of the Estate ..................................................................................18

    The Cash Management System described herein is maintained in the ordinary
    course and is essential to the Debtor's ongoing operations, especially to
    services provided by the Debtor to the Non-RCBSR Entities under the
    Servicing Agreements. The preservation and continuation of the Cash
    Management System is essential to the Debtor's continued operations. ..............18

    D.    The Debtor Should Be Granted Authority to Continue Its Accounting
    Policies and Practices .........................................................................................19

    E.    Continued Use of Investment Practices ..............................................................20

CONCLUSION ................................................................................................................22

## CASES

*In re Arriva Pharmaceuticals, Inc.*
Case No. 07-42767 (Bankr. N.D. Cal. Sept. 11, 2007 order) ...................................19

*In re Baldwin-United Corp*
79 B.R. 321 (Bankr. S.D. Ohio 1987)....................................................................16

*In re eStyle, Inc.*
Case No. 08-13518 (Bankr. C.D. Cal. April 18, 2008 order) ...............................18

*In re Gold Standard Baking, Inc.*
179 B.R. 98 (Bankr. N.D. Ill. 1995)................................................................16, 17

*In re Hansaben Investments, LLC*
Case No. 22-30258 (Bankr. N.D. Cal. May 27, 2022)......................................18, 19

*In re Heller Ehrman LLP*
Case No. 08-32514 (Bankr. N.D. Cal. Dec. 30, 2008 order) ...........................18, 19

*In re Roman Catholic Bishop of Stockton*
Case No. 14-20371-C-11 (Bankr. E.D. Cal. Jan. 24, 2014 order) ....................18, 19

*In re Service Merchandise, Co., Inc.*
240 B.R. 894 (Bankr. M.D. Tenn. 1999) ...............................................................21

*In re Young*
205 B.R. 894 (Bankr. W.D. Tenn 1997) ................................................................17

*In re ZF in Liquidation LLC fka Zacky Farms, LLC*
Case No. 12-37961-B-11 (Bankr. E.D. Cal. Nov. 5, 2012 order)......................18, 19

## STATUTES¶

Title 11, United States Code §105 .....................................................................1, 14

Title 11, United States Code §1107 .........................................................................3

Title 11, United States Code §1108 .........................................................................3

Title 28, United States Code §1334 .........................................................................1

Title 28, United States Code §1408 .........................................................................1

Title 28, United States Code §1409 .........................................................................1

Title 28, United States Code §157 ...........................................................................1

## OTHER AUTHORITIES

United States Trustee Guideline 4.4.6.................................................12, 14, 16, 21

MOTION RE CASH MANAGEMENT

1

**RULES**

Bankruptcy Rule 2002 ............................................................................................................3

Bankruptcy Rule 6004 ..........................................................................................................21

Local Rule 2015 ..............................................................................................1, 12, 14, 21

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION RE CASH MANAGEMENT

The Roman Catholic Bishop of Santa Rosa (the "RCBSR" or the "Debtor in Possession"), debtor and debtor in possession, moves the Court for an Order (1) Authorizing Continued Use of Existing Cash Management System, Operational Bank Accounts, and Related Investment Account, (2) Excusing Compliance with Section 345(b), and (3) Authorizing Continued Use of Current Investment Policy (the "Motion"). In support of this Motion, the Debtor relies upon the Declaration of Deacon Joe Oberting in Support of Chapter 11 Petition and First Day Motions ("Oberting Background Decl."), the Declaration of Deacon Joe Oberting filed in support of this Motion ("Oberting Decl."), the Declaration of Adrienne Moran in Support of Chapter 11 Petition and First Day Motions ("Moran Decl.").

## JURISDICTION

1. This Court has jurisdiction over this case under 28 U.S.C. §§ 157 and 1334. Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b). The statutory bases for the relief requested include §§ 105(a) and 345(b) of the Bankruptcy Code[1] and Rule 2015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of California (the "Local Rules").

2. The RCBSR does not, by filing its petition for relief and other documents in this bankruptcy case, waive any of its rights under any applicable law, including, without limitation, the Code of Canon law, the First Amendment of the United States Constitution, the Constitution for the State of California, California's law on corporations sole (California Corporations Code §§ 10000-10015), the Religious Freedom Restoration Act, the church autonomy doctrine, charitable trust law, California trust law, and the rights to object to disclosure of information and to contend that certain assets discussed in the Motion are not property of the estate.

## RELIEF REQUESTED

3. By this Motion, the Debtor in Possession seeks, *inter alia*, entry of an order (a) waiving the Local Rules and United States Trustee Guidelines ("UST Guidelines") to the extent necessary in order for the Debtor to continue its use of its existing cash management system, (b) authorizing the Debtor to continue using its prepetition bank accounts and business forms,

---

[1] All section references hereafter are to Title 11 of the United States Code unless noted otherwise.

Case: 23-10113    Doc# 5    Filed: 03/13/23    Entered: 03/13/23 11:56:56    Page 5 of 33

including a waiver of the requirement that the legend "debtor in possession" be imprinted on any existing checks and business forms, and (c) authorizing the Debtor to continue the use of its existing cash management system and accounting policies and practices. The Debtor also seeks to continue its investment policies during its bankruptcy case, without posting any bonds pursuant to section 345(b) of the Bankruptcy Code. The Debtor seeks this authorization to ensure its orderly entry into bankruptcy and to help administer its business efficiently and avoid the disruptions, distractions, delays and significant expense that otherwise would inevitably divert the Debtor's attention from urgent matters during the initial stages of its bankruptcy case.

4.      As noted below in more detail, all of the relevant banks where the RCBSR's bank accounts are located are FDIC insured banking institutions which have complied with the United States special depository procedures under Bankruptcy Code section 345 and are on the United States Trustee's list of authorized depositories for the Northern District of California, except for a stock transfer account at Merrill Lynch. While Merrill Lynch is not an FDIC insured banking institution, it is a subsidiary of Bank of America, the third largest bank in the United States, and the stock transfer account is used solely to monetize donated stock. The two investment type accounts at issue are at the Catholic Community Foundation, which accounts are at Summit State Bank (on the U.S. Trustee approved list) and Catholic Extension, which is an independent 501(c)(3) organization that is not insured by the FDIC.

5.      A copy of the proposed order on this Motion is attached hereto as Exhibit A.

## BACKGROUND

6.      On March 13, 2023, the RCBSR commenced its chapter 11 reorganization case. The RCBSR filed this case to reorganize its financial affairs pursuant to a plan of reorganization that will, among other things, fairly, justly, and equitably compensate survivors of sexual abuse by clergy or others associated with the RCBSR and bring healing to survivors, parishioners and others affected by past acts of sexual abuse. The RCBSR has limited funds with which to respond to the variety of demands from its creditors. The RCBSR requires the bankruptcy court's protection and the protection of the bankruptcy laws to make fair and equitable payment on all of the claims against it, including the claims by survivors of abuse, trade creditors, the parishes and

others, while continuing its ministries and support it offers to Catholic parishes and communities. Additional detailed background information on the RCBSR can be found in the Oberting Background Decl. and the Moran Decl.

7. In each diocesan bankruptcy where a plan of reorganization has been confirmed, the plan confirmed by the bankruptcy court was a pot plan negotiated through extensive mediation, after exchanging information with the Creditors Committee, among the interested parties in the case which settled disputes over what was property of the bankruptcy estate and provided for a settlement of the claims of Abuse survivors. The RCBSR intends to negotiate a pot plan of reorganization as early as possible which will: (a) allocate the RCBSR's remaining assets fairly among the legitimate competing interests for such property; (b) provide a process to fully, fairly and expeditiously liquidate claims of Abuse survivors; and (c) permit the RCBSR to carry on the RCBSR's essential ministries and services so the RCBSR can continue to meet the needs of the Non-Debtor Catholic Entities, parishioners, and others who rely on the RCBSR's ministry, education, and charitable outreach.

## PROCEDURAL POSITION OF THIS MOTION

8. Pursuant to sections 1107 and 1108, the Debtor continues to operate its business and manage its property as a debtor-in-possession. No trustee or examiner has been requested or appointed in this case.

9. Notice of this Motion has been provided to the 20 largest unsecured creditors, the secured creditors if any, the Office of the United States Trustee, the Internal Revenue Service, corresponding state agencies, as well as other governmental agencies, to the extent required by the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the Northern District of California, and those persons who have formally appeared and requested service in this case pursuant to Bankruptcy Rule 2002. Given the nature of the relief requested, the Debtor in Possession submits that no further notice of this Motion is necessary.

## FACTUAL BACKGROUND FOR RELIEF REQUESTED

10. As further discussed in the Oberting Background Decl., the RCBSR provides certain administrative services and pooling arrangements for the various components of the

Case: 23-10113    Doc# 5    Filed: 03/13/23    Entered: 03/13/23 11:56:56    Page 7 of 33

RCBSR, as well as for numerous Non-Debtor Catholic Entities pursuant to service management agreements (collectively, the "Services Agreements") and otherwise.[2]  The RCBSR provides services including appointment of priests and permanent deacons, maintains the remuneration policy for priests (including retirement plans and health insurance plan), while the parishes pay for these items organized and administered by the RCBSR.  The RCBSR provides a defined contribution retirement plan and health and life insurance plans for lay personnel for which the parishes pay.  Insurance coverage packages for buildings, liability, workers compensation, and earthquake are also provided from a pooled insurance plan.  Parishes are provided with retained legal services and human resources management as well as financial guidance in the form of human resource and financial management handbooks, backed by personnel in the chancery office to assist as questions arise.  In addition, the Services Agreements ensure compliance with Canon Law and promotes consistent policies and procedures within the Diocese of Santa Rosa.  Each Parish pays the RCBSR a service fee as compensation for the services provided currently set at approximately 9.1% of the Parishes' annual total revenue from the prior year.  The Service Agreements are a significant source of the RCBSR's annual funding.  Oberting Decl., ¶6.

**Bank Accounts Related to Debtor's Cash Management System**

11.    In the ordinary course of business, the Debtor utilizes a centralized cash management system (the "Cash Management System") to facilitate the financial operation of its central administrative offices.  The Debtor in Possession has bank accounts with a number of financial institutions (the "Banks") in order to facilitate the Cash Management System.  A list of the Debtor in Possession's bank accounts along with the balance in the account as of December 31, 2022, can be found attached to the Oberting Declaration as Exhibit A (the "Bank Accounts").

12.    A diagram setting forth the flow of funds among the Bank Accounts and summarizing the Cash Management System, as it exists on the Petition Date, is attached to the Oberting Declaration as Exhibit B.

13.    The RCBSR's Bank Accounts are held at West America Bank, Wells Fargo Bank,

---

[2] The Non-Debtor Catholic Entities are described in the Oberting Background Decl. and include the Parishes, RCWC, CCF, Catholic Charities, CNHS, and Cemeteries.

Summit State Bank, U.S. Bank, and Merrill Lynch. There are also funds at PNC Institutional Asset Management, which is a marketing name for The PNC Financial Services Group, Inc. as the parent of PNC Bank, National Association ("PNC Bank"). Except for Merrill Lynch, these banks are all FDIC insured banking institutions which have complied with the United States special depository procedures under Bankruptcy Code section 345 and are on the United States Trustee's list of authorized depositories for the Northern District of California. While Merrill Lynch is not an FDIC insured banking institution, it is a subsidiary of Bank of America, the third largest bank in the United States. Oberting Decl., ¶9.

14. The RCBSR also has funds in a pooled account with Catholic Extension, an independent 501(c)(3) organization that is not a FDIC insured institution. Catholic Extension operates a pooled investment fund on behalf of certain Catholic Dioceses (the "Mission Dioceses"), named the Mission Diocese Fund. In 2014, the RCBSR deposited $1,000,000 into this fund, which funds are managed by Catholic Extension and invested by Cambridge Associates. The RCBSR has neither deposited nor withdrawn funds since it made its initial deposit. Information about Mission Diocese Fund is attached to the Oberting Decl. as Exhibit C. The RCBSR is informed that other Catholic dioceses that have filed chapter 11 have been able to maintain their funds in Mission Diocese Fund. Oberting Decl., ¶10.

15. The Bank Accounts maintained by the RCBSR contain property of the estate and property administered for others under the various Services Agreements or held in trust for others, which is not property of the estate. Further, many of the funds in the Bank Accounts are subject to charitable restrictions and constitute restricted funds, which are not available to creditors of the estate. The RCBSR maintains records to account for the differing character of the funds it holds, as described above. Oberting Decl., ¶11.

16. In the ordinary course of business, the RCBSR maintains the Bank Accounts described herein to facilitate the financial operations of its central administrative offices.

Debtor's General Operating Accounts

17. The RCBSR maintains an operating bank checking account and money market account at Wells Fargo (#7582 and #4305, respectively) (collectively, the "General Fund"). The

General Fund acts as the Debtor's central repository of funds and is the primary payor account for substantially all of the Debtor's expenses. The General Fund is funded from multiple sources including fees and deposits pursuant to the Parish Services Agreements (including assessments), certain contributions from the Annual Ministry Appeal ("AMA"), funds for projects and ministries operated by the RCBSR, and from grants. Oberting Decl., ¶13.

18.    The General Fund checking account generally has less than $250,000. Funds in excess of this amount are transferred to the General Fund's money market account and moved back into the General Fund as needed to fund disbursements. Oberting Decl., ¶14.

Payroll Account

19.    The RCBSR maintains a payroll account at West America Bank (#8396). The payroll account is funded from the General Fund for payroll expenses of RCBSR employees, including the payment of payroll taxes, and employee contributions for the 403(b) Lay Pension defined contribution plan. The RCBSR also administers payroll for most of the Parishes, although some administer their own payrolls funded by those entities, and RCBSR is reimbursed for amounts paid on behalf of the Parishes. The Debtor in Possession is filing a separate motion to approve payment of any unpaid pre-petition wages and benefits up to the priority amounts for its employees, although the RCBSR has prepaid its payroll so there may be no pre-petition wages owed. Oberting Decl., ¶15.

Health Insurance Accounts

20.    The RCBSR maintains two accounts at Wells Fargo (#5567) ("Health Insurance Checking") and (#4306) ("Health Insurance Money Market") to administer and pay expenses for health insurance. Oberting Decl., ¶16.

21.    For health insurance, the RCBSR is insured through the Reta Trust ("RETA"). RETA provides healthcare-related benefits to U.S. dioceses and Catholic organizations that are aligned with the teachings of the Roman Catholic Church. RETA manages contracts and provider networks with national health plans including Blue Cross Blue Shield organizations, Kaiser Permanente, Delta Dental and VSP Vision Care. All plans are self-insured, and RETA sets the contribution funding rates. Oberting Decl., ¶17.

22.     On about the 20th day of the month for the upcoming month, RETA sends an invoice to the RCBSR which includes the health insurance premiums for the RCBSR and certain of the Non-Debtor Catholic Entities (Parishes, Catholic Charities, Cemeteries and CNHS).  On the 2nd or 3rd day of the month, RETA withdraws via ACH the entire amount of the invoice in the approximate amount of $500,000 (100%, including the other entities' portions) from the Health Insurance Checking account.  RETA also withdraws from the accounts of the applicable Non-Debtor Catholic Entities the allocated amount owed by such entity (thus RETA is initially collecting twice).  However, if RETA is unable to pull the full amount owing from one of the other entities, the RCBSR will bill that entity for the amount it advanced on its behalf.  On the 15th of the month, RETA performs a reconciliation and refunds to the RCBSR Health Insurance Checking account the amounts it collected from the other entities, which is typically the full amount (approximately $500,000).  Oberting Decl., ¶18.

23.     When RETA has approval from its Board of Trustees, as a result of reviewing its own cash reserves, it has in the past refunded a portion of health benefits premiums on a monthly basis.  The last such refund received by RCBSR was in September 2022.  Oberting Decl., ¶19.

24.     When there are excess funds in the Health Insurance Checking account, the RCBSR transfers such funds to the Health Insurance Money Market account to maximize interest accrual.  Oberting Decl., ¶20.

25.     Toward the end of the fiscal year, the funding of the Health Insurance account is reviewed.  If it is determined there are sufficient excess funds, the RCBSR will inform the appropriate entity or entities that an upcoming monthly billing cycle will be skipped.  Oberting Decl., ¶21.

Self-Insurance – Property, Liability, Earthquake, Auto, and Workers Compensation Insurance accounts

26.     The RCBSR maintains bank accounts at Wells Fargo (#1339) ("Self-Insurance Checking Account") (#3724) ("Self-Insurance Money Market Account") to manage insurance programs for property, liability, earthquake, and auto insurance and for worker's compensation insurance for the RCBSR and the Non-Debtor Catholic Entities.  As noted below in paragraph 32,

Case: 23-10113   Doc# 5   Filed: 03/13/23   Entered: 03/13/23 11:56:56   Page 11 of 33

the RCBSR also has Self-Insurance funds held at PNC Bank in investment accounts overseen by CAPTRUST, an advisor for the RCBSR for the self-insurance reserves.  Oberting Decl., ¶22.

27.    The RCBSR and Non-Debtor Catholic Entities are partially self-insured for property, liability, earthquake, and auto insurance and for worker's compensation coverage.  The RCBSR participates in a pool of insureds managed by Catholic Mutual Insurance Company ("Catholic Mutual").  Being a part of a pool allows for additional buying and negotiating power.  Oberting Decl., ¶23.

28.    The RCBSR collects and maintains funds on behalf of the Non-Debtor Catholic Entities and other participating entities pursuant to the RCBSR's performance under the Services Agreements.  If the RCBSR or a Non-Debtor Catholic Entity were to terminate its participation in the pooled insurance, that entity would be entitled to the percentage portion of that entity's funds transferred to that account during the last insurance year, divided by the total funds contributed to the account over the last insurance year.  The insurance year runs from July 1 to June 30.  Oberting Decl., ¶24.

29.    The payment of the premiums and other fees is made from the Self Insurance Checking Account to Catholic Mutual.  If at the end of the year, the balance of the account is determined to have created a surplus, then such surplus is applied toward reducing the increase in premium the following year.  Oberting Decl., ¶25.

30.    The RCBSR pays approximately $2 million annually in July of each year to Catholic Mutual for property, liability, earthquake, and auto insurance coverage.  The RCBSR bills each entity its allocated share of the current year's premiums, allocated based on the value of covered property.  Oberting Decl., ¶26.

31.    For worker's compensation coverage, the RCBSR pays approximately $625,000 annually to Church Mutual.  The RCBSR notifies the participating entities in March what their portion of the expense is, and the entities then pay their share of the insurance premium, similar to how the property, liability, earthquake, and auto insurance coverage is handled as described above.  Oberting Decl., ¶27.

32.    The RCBSR pays the property, liability, earthquake, and auto insurance and

worker's compensation premiums in aggregate upon receipt of the invoices and is reimbursed by the participating entities over the course of the following year.  Oberting Decl., ¶28.

### Self-Insurance Investment Accounts

33.　　The RCBSR maintains Self-Insurance Investment Accounts (Extension Mission Diocese account #1002 and PNC Investment #0465).  In or about 1999, the RCBSR held a campaign to raise funds to cover potential losses that may not be covered by insurance.  These self-insurance funds (and other funds added since the major campaigns) are held in the Self-Insurance Investment Accounts.  Oberting Decl., ¶29.

### Stock Transfer Account

34.　　The RCBSR maintains a Stock Transfer Account (Broker Account) at Merrill Lynch (#4A15).  This account is used to monetize donations of stock.  The funds are then sent to the designated parish or other intended donee.  Oberting Decl., ¶30.

Restricted Accounts

35.　　The RCBSR maintains multiple restricted accounts related to four general categories: Restricted AMA funds, Restricted Retirement funds, Restricted Lay Pension 403(b) and Life Insurance and Other Restricted funds.  Oberting Decl., ¶31.

36.　　Restricted funds may not be used for any purpose inconsistent with the intent of the donation or the intent of the priest or lay benefit.  These funds are tracked specifically in the RCBSR's books and records and maintained in a separate bank account.  Oberting Decl., ¶32.

### Restricted Annual Ministry Appeal Accounts

37.　　The RCBSR maintains three bank accounts to manage funds raised in connection with the Annual Ministry Appeal ("AMA"): Wells Fargo Checking Account (#7632) ("AMA Checking Account"), Wells Fargo money market account (#4732) ("AMA Money Market Account"), and Summit State Bank account (#1944) ("Summit AMA Account").  The AMA is an annual appeal commencing in February or March of each year to raise restricted funds for certain specified ministries of the Diocese.  Oberting Decl., ¶33.

38.　　The target amount of the AMA is established as a goal by the Bishop annually and communicated to the Parishes.  Historically, the AMA has raised approximately $900,000 each

year. The AMA goal for 2023 is $897,111. There are numerous purposes, programs and campaigns utilized to raise the funds. Oberting Decl., ¶34.

39.     Money raised by the parishes remitted in the form of checks and cash are deposited into the AMA Checking Account at Wells Fargo. Receipts in the form of credit card payments or direct deposit are deposited into the Summit AMA Account. Oberting Decl., ¶35.

40.     If any parish remits more than its target fund-raising goal, the excess is refunded to such parish from the AMA bank account annually. Oberting Decl., ¶34.

41.     Each month during the fiscal year, approximately $75,000 ($1/12^{th}$ of $900,000) is transferred from the AMA Checking Account to the Chancery General Fund, which funds are disbursed exclusively for the benefit of the various diocesan ministries. Income and expenses of each ministry is tracked within the RCBSR main accounting system. None of the AMA funds are retained or disbursed for the benefit of the RCBSR. AMA funding supports less than half of the budgets of all ministries collectively. Ministries also are charged with seeking funding from grants, various fees and other donations. Oberting Decl., ¶37.

Restricted Retirement Accounts

42.     The RCBSR maintains two bank accounts at Wells Fargo (#5160) ("Priests Retirement Checking Account"), and (#4731) ("Priests Retirement Money Market") for funds held relating to its Priest Retirement Plan. There also is a Bishop Retirement SERP at U.S. Bank (#5400) ("Bishop SERP Account") and a "frozen" Defined Benefit Lay Pension Plan with funds held at PNC Bank. Oberting Decl., ¶38.

43.     The RCBSR, Parishes and other entities contribute collectively $1,125 per priest per month for retirement for those priests serving them. The RCBSR contributes for the benefit of the Bishop ($5,978 as per the actuarial report) and the Vicar General and sends a check from the General Fund to the Priests Retirement Checking Account. The RCBSR, the parishes and schools each send their portion to the Priests Retirement Checking Account. In the event a priest provides services to more than one entity, the $1,125 is allocated to each entity via a formula. Oberting Decl., ¶39.

44.     Certain monthly disbursements are made from the Priests Retirement Checking

Account, including retirement funds for certain unincardinated priests and long-term care and life insurance costs for retired or unassigned priests. Contributions to the Bishop's SERP are transferred from this account to the Bishop SERP account at U.S. Bank (#5400). Any remaining balance in this account are transferred to the Priest Pension fund. Oberting Decl., ¶40.

45. The RCBSR maintains a SERP pension plan for the benefit of the Bishop via the Bishop SERP Account. The RCBSR currently has one living retired bishop who is receiving monthly benefit payments, and one active bishop who would be a beneficiary upon his retirement. The actuary retained by the RCBSR, Nicolay Consulting Group, provides actuarial reports annually which indicate how much money should be deposited into the Bishop SERP Account. This amount is transferred via check monthly from the Priests Retirement Checking Account into the Bishop Retirement SERP Account at U.S. Bank (#5400). Oberting Decl., ¶41.

46. The RCBSR maintained a Diocesan Defined Benefit Lay Pension Plan until 2014, at which time it was frozen. A new plan was formed as the Defined Contribution Plan. Effective June 20, 2014, and facing a high unfunded pension liability, the Diocesan Defined Benefit Lay Plan was "frozen," meaning each participant's defined pension benefit was determined as of the freeze date and remains unchanged regardless of future pay increases or length of service. Oberting Decl., ¶42.

47. The Diocesan Defined Benefit Lay Pension Plan remains underfunded, and the RCBSR and certain of the Non-Debtor Catholic Entities pay annual premiums towards the underfunded balance. Each of these entities pays 3.6% of its gross payroll into a restricted account. Nicolay Consulting Services also serves as the actuary for the frozen plan. Nicolay provides actuarial reports annually which indicate how much money should be deposited into the frozen plan. The trust fund for the frozen plan is held in custodial accounts at PNC Bank, so when deposits are made into the plan they are sent to PNC Bank. Oberting Decl., ¶43.

Restricted Lay Pension 403(b) and Life Insurance

48. The RCBSR maintains two restricted funds bank accounts at Wells Fargo Bank Account (#5152 (checking) and #4308 (money market) collectively, "Diocese Restricted Funds Accounts"). On July 1, 2014, the Diocese implemented a Defined Contribution Plan covering

Case: 23-10113    Doc# 5    Filed: 03/13/23    Entered: 03/13/23 11:56:56    Page 15 of 33

eligible lay employees. These employees are eligible upon attaining one year of service and are scheduled to work at least 20 hours per week. The RCBSR, parishes and schools make employer contributions to the Defined Contribution Plan in the amount of 5.5% of gross payroll for each eligible employee. The RCBSR portion is paid from the General Fund and the parishes and schools are billed. The parishes and schools pay their portions 45 days after month-end. These funds are deposited into the Diocese Restricted Fund checking account. Oberting Decl., ¶44.

49. The RCBSR's 403(b) plan is administered by OneAmerica Financial Partners ("OneAmerica"). Employer contributions are sent to OneAmerica via ACH debit from the Diocese Restricted Fund account. Employee contributions are sent to OneAmerica via ACH debit from the payroll account at West America Bank (#8396). Oberting Decl., ¶45.

Other Restricted Funds

50. There is a restricted Capital Campaign account held at Summit State Bank (#1951), which contains the remaining $1,000 raised in conjunction with a prior capital campaign. The balance has not changed in several years. In addition, there is a restricted Catholic Cursio Movement account held at Summit State Bank (#9518) containing earmarked residual funds from a prior fundraising campaign. The balance has not materially changed in several years. Oberting Decl., ¶46.

51. The Diocese Restricted Funds Accounts also are used to hold funds that are in trust and donor restricted, including Second Collections, which are funds collected at the parish level and earmarked for specific charitable causes or organizations. Payments for pension contributions for lay personnel, life insurance, and certain other expenses relating to memorials, funerals, priest welfare, and consulting are paid from this account monthly. Oberting Decl., ¶47.

RCBSR Funds at the Catholic Community Foundation

52. The RCBSR has certain funds invested with the Catholic Community Foundation ("CCF"), an independent entity and non-debtor, which funds were received (a) as a directed donation from one family and (b) from closure of a camp many years ago. The funds are held in trust for the benefit of parishes, schools and various CCF funded programs. Funds are held in two CCF accounts at Summit State Bank: checking account (#6427) and a certificate of deposit

(#2796).  Oberting Decl., ¶48.

53.     The RCBSR collects a management fee from each of the 70 accounts within the fund on behalf of CCF.  Those fees are deposited into account #6427.  Oberting Decl., ¶49.

**Cash Management System**

54.     All of the above Bank Accounts, along with the purpose for each and the method of earmarking funds and transferring funds between accounts are referred to collectively as the "Cash Management System."  The Cash Management System permits the RCBSR to fulfill its obligation to donors to keep restricted funds, funds held in trust for others or funds donated for a specific purpose segregated from the RCBSR's operating and unrestricted funds.  The RCBSR's employees are familiar and comfortable with the current Cash Management System.  Oberting Decl., ¶50.  Given the relatively large number of accounts, following Local Rule 2015-1 and the UST Guidelines would be overly burdensome and would not assist the administration of the RCBSR's bankruptcy case in any way.

**Prepetition Employee Wages and Benefits**

55.     The Debtor has filed a motion contemporaneously herewith requesting entry of an order (the "Payroll Order") authorizing it to pay all prepetition wages, salaries, and related benefits which were due, owing, or accrued but were not yet due as of the Petition Date.  Payments for payroll-related taxes and benefits sought to be authorized by entry of the Payroll Order, including payroll taxes and payments relating to medical, dental, and other benefits will be drawn on the existing payroll account, Health Plan Account and Health Insurance Reserve Account at Wells Fargo and West America Bank.  Oberting Decl., ¶51.

**Compelling Reasons to Maintain the Debtor's Cash Management System and Accounting Policies and Practices**

56.     The Debtor in Possession is aware of the requirement under Local Rule 2015-1 and UST Guideline 4.4.6 that, upon filing a petition for relief under chapter 11, the debtor close its existing bank accounts and open new debtor-in-possession accounts marked to show that the debtor is operating as a debtor-in-possession.  However, the Debtor believes it should not be required to comply with this requirement for the compelling reasons that complying with Local

Rule 2015-1 and UST Guideline 4.4.6 would be unduly costly, overly burdensome, not to the benefit of any party in interest, and of no help in the overall administration of the estate.

57.     The Debtor's Cash Management System is maintained in the ordinary course and is essential to the Debtor's ongoing operations.   The Cash Management System provides significant benefits to the Debtor, including, among other things, the ability to: (i) account properly for restricted funds and funds held in trust; (ii) control funds; (iii) perform its duties under the Services Agreements; (iv) ensure the maximum availability of funds when necessary; (v) maximize interest on deposit accounts; (vi) reduce administrative expenses and operational disruption by facilitating the movement of funds and the development of more timely and accurate account balance information; and (vii) continue accounting practices and operational procedures familiar to the Debtor's staff.  As a practical matter, because of the Debtor's financial structure, it would be extremely difficult and prohibitively expensive to establish and maintain a separate postpetition cash management system.  Oberting Decl., ¶53.

58.     The delay and disruption caused by closing the existing Bank Accounts and opening new accounts would delay the Debtor's postpetition payment of its ordinary course expenses and put a strain on the Debtor's relations with its accounting staff, the Non-Debtor Catholic Entities served by the Debtor under the Services Agreements, donors, key suppliers, and employees.  By preserving continuity and avoiding the disruption and delay to the Debtor's activities under the Services Agreements, payroll obligations and ministries that would necessarily result from closing the existing Bank Accounts and opening new accounts, all parties in interest, including Non-Debtor Catholic Entities, employees, donors and vendors, will be best served.  Furthermore, the administrative burden of overseeing such a transition would place a substantial burden on the Debtor's management and personnel at a critical time in this case.  The inevitable delays and confusion would further impede the Debtor's ability to pay operating expenses in the ordinary course, potentially compromising relationships with Non-RCBSR Entities, donors, vendors, suppliers and employees.  This could seriously jeopardize the Debtor's reorganization efforts.  Oberting Decl., ¶54.

59.     The Debtor requires the ability to continue to utilize its Cash Management System

so that it may continue its operations uninterrupted. The Debtor's Cash Management System is maintained through well-established relationships at the various financial institutions and series of related accounts which allow the Debtor to manage and control receipts and disbursements and to account for all transactions. Oberting Decl., ¶55.

60. Closing such accounts will delay the services provided by the Debtor under the Servicing Agreement, payment of payroll and other ordinary course expenses, will increase the cost of administration, impede the Debtor's efforts to continue to operate in the normal course of business, potentially undermine the confidence of donors that their donated funds are being held in trust and used for the intended uses, and will be a significant distraction to the Debtor's management and accounting staff. Oberting Decl., ¶56.

61. Moreover, each year the Debtor's financial statements are audited by a public accounting firm and the closing of the Debtor's Bank Accounts or any significant switch in accounting policies and practices would unnecessarily complicate that process. Oberting Decl., ¶57.

## LEGAL ARGUMENT

### A. Maintaining the Debtor's Current Bank Accounts is in the Best Interests of the Estate and is Authorized Pursuant to 11 U.S.C. § 105(a)

The United States Trustee for the Northern District of California has established certain operating guidelines for debtors in possession. One such provision requires a chapter 11 debtor in possession to open new debtor in possession bank accounts and to close all existing accounts. *See* UST Guidelines 4.4.6. The UST Guidelines also require that new bank accounts be opened in certain financial institutions designated as authorized depositories by the United States Trustee. *See* UST Guidelines 4.4.6(a). In addition, Local Rule 2015-1 requires the chapter 11 debtor indicate "debtor in possession" on any signature card for debtor bank accounts.

Pursuant to Bankruptcy Code section 105(a), the Debtor seeks a waiver of the United States Trustee requirements and Local Rule 2015-1 relating to the closing and re-opening of new bank accounts. Such a requirement would unnecessarily disrupt the Debtor's operations and would not provide any significant benefit to the Debtor's estate, its creditors or parties in interest.

Case: 23-10113   Doc# 5   Filed: 03/13/23   Entered: 03/13/23 11:56:56   Page 19 of 33

Courts have long recognized that the strict enforcement of bank account closing requirements does not serve the rehabilitative purposes of chapter 11. Accordingly, courts regularly have waived such requirements and permitted debtors to maintain their existing bank accounts and cash management systems, treating such a request as a relatively "simple matter." *See, e.g., In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). Moreover, the UST Guidelines do not have the force of law, and the Court may excuse compliance with certain of them. *See In re Gold Standard Baking, Inc.*, 179 B.R. 98, 101-02 (Bankr. N.D. Ill. 1995) (United States Trustee lacks statutory authority to direct how a debtor should conduct its ordinary course business operations). All parties in interest to the reorganization case, including the Debtor, Non-RCBSR Entities, employees, trade vendors and other creditors, and parishioners within the Diocese will be best served by preserving operational continuity and avoiding the disruption and delay to the RCBSR's financial activities and payroll that would necessarily result from closing the Debtor's existing accounts and the opening of new accounts.

The Debtor requests authority to maintain and continue to use the existing Bank Accounts in the names and with the account numbers existing immediately prior to the Petition Date. The Debtor further requests authority to deposit funds in, and withdraw funds from, any such accounts by all usual means, including, but not limited to, checks, wire transfers, automated clearinghouse transfers, electronic funds transfers and other debits, and to treat the existing accounts for all purposes as debtor-in-possession accounts.

The Debtor has endeavored to ensure that no checks in payment of prepetition obligations remained outstanding as of the Petition Date. To further ensure against the payment of prepetition debts – except for prepetition debts that the Court specifically authorizes to be paid – the RCBSR will stop payment on any checks for prepetition obligations that are outstanding as of the Petition Date and will begin issuing new checks postpetition with a significant gap in the numbering sequence, to make it easier to distinguish between prepetition and postpetition checks.

The Debtor further requests authority for the banks at which it maintains existing accounts, subject to and in accordance with the terms of any account agreements and applicable non-bankruptcy law, to accept and honor all representations or instructions from the Debtor as to which

checks, drafts, wire transfers, or other transfers (each, an "Item" and, collectively, the "Items") should be honored or dishonored. The Debtor requests that its banks have absolute authority to follow such representations and instructions, regardless of the particular transferee named on an Item, the date of such Item (prepetition or postpetition), and the banks' knowledge or belief as to the existence of Court authorization for the transfer; provided, however, that the banks are not required to honor any Item as to which there are insufficient funds in the applicable account.

The Debtor also requests a waiver of the requirement of UST Guideline 4.4.6 that the Debtor establish specific bank accounts for tax payments. The Debtor believes that its tax obligations can be paid most efficiently out of its existing accounts, and its monthly operating reports will permit the United States Trustee to monitor tax payments. The Debtor submits that the creation of new debtor-in-possession accounts designated solely for tax obligations is unnecessary and inefficient.

**B.**     **Maintaining the Debtor's Existing Business Forms is in the Best Interests of the Estate**

To minimize administrative expense and delay, the Debtor requests authority to continue to use its correspondence and business forms, including, but not limited to, purchase orders, letterhead, envelopes, charitable solicitation materials, and checks (collectively, the "Business Forms"), substantially in the form that they existed immediately prior to the Petition Date, without reference to the RCBSR's status as a debtor-in-possession. The Debtor has made no secret of the serious issues it faces as described in the Oberting Background Declaration and the Moran Declaration. The financial condition of the Debtor and the status of the Abuse cases against the Debtor have been the subject of local media scrutiny for several years. The Debtor's reorganization case will likely generate substantial public reports and comments, both locally and nationally. It is most likely that any party to a transaction with the Debtor will be aware of its status as a debtor in possession.

Moreover, the Court has the power to allow the Debtor to deviate from the UST Guidelines on this point. *See, e.g., In re Young*, 205 B.R. 894, 897 (Bankr. W.D. Tenn 1997) (United States Trustee may not require debtor to imprint the words "debtor-in-possession" on his checks); *In re Gold Standard Baking*, *supra*, at 105-106 (same). In other large cases, bankruptcy courts in various

California Districts have allowed debtors to use their prepetition business forms. *In re Roman Catholic Bishop of Stockton*, Case No. 14-20371-C-11 (Bankr. E.D. Cal. Jan. 24, 2014 order); *In re Hansaben Investments, LLC*, Case No. 22-30258 (Bankr. N.D. Cal. May 27, 2022); *In re ZF in Liquidation LLC fka Zacky Farms, LLC*, Case No. 12-37961-B-11 (Bankr. E.D. Cal. Nov. 5, 2012 order); *In re eStyle, Inc.*, Case No. 08-13518 (Bankr. C.D. Cal. April 18, 2008 order); *In re Heller Ehrman LLP*, Case No. 08-32514 (Bankr. N.D. Cal. Dec. 30, 2008 order).

If the Debtor is not permitted to maintain and use its existing accounts and to continue to use its existing Business Forms, the resultant prejudice will include: (a) disruption in the ordinary financial affairs and business of operations of the Debtor, to the detriment of employee morale and vendor and parishioner relationships; (b) delay in the administration of the Debtor's estate and to the pastoral care and services provided to all of the parishioners within the Debtor; and (c) cost to the Debtor and its estate to set up new systems, open new accounts, and print new Business Forms.

**C.   Maintenance of the Debtor's Existing Cash Management System is in the Best Interests of the Estate**

The Cash Management System described herein is maintained in the ordinary course and is essential to the Debtor's ongoing operations, especially to services provided by the Debtor to the Non-RCBSR Entities under the Servicing Agreements. The preservation and continuation of the Cash Management System is essential to the Debtor's continued operations.

The existing Cash Management System allows the Debtor to segregate, trace and account properly for restricted funds and manage all of its cash flow needs centrally. The existing Cash Management System includes necessary accounting controls to enable the Debtor, as well as its creditors and the Court, to trace funds through the system and ensure all transactions are documented and ascertainable. The existing Cash Management System has proven to be an efficient and effective system to manage the Debtor's cash flow and supports the Debtor's obligations under the Servicing Agreements, which provide a significant source of income for the Debtor. In accordance with past practices, the Debtor will continue to maintain current records with respect to all transactions involving the Debtor's Cash Management System. Given its central role in funding numerous of the Debtor's vital operating expenses, such as performing under the

Case: 23-10113   Doc# 5   Filed: 03/13/23   Entered: 03/13/23 11:56:56   Page 22 of 33

Servicing Agreements, collecting and maintaining restricted funds, payroll, employee benefits and other payables, the Debtor's inability to continue using the Cash Management System would severely, and perhaps irreparably, disrupt its operations and is mission.

In addition, given the financial structure of the Debtor, it would be difficult, if not impossible, for the Debtor to establish an entirely new system of accounts and a new cash management system. In other large cases, bankruptcy courts in various California Districts have allowed debtors to continue to use their existing cash management systems. *In re Roman Catholic Bishop of Stockton*, Case No. 14-20371-C-11 (Bankr. E.D. Cal. Jan. 24, 2014 order); *In re Hansaben Investments, LLC*, Case No. 22-30258 (Bankr. N.D. Cal. May 27, 2022); *In re ZF in Liquidation LLC fka Zacky Farms, LLC*, Case No. 12-37961-B-11 (Bankr. E.D. Cal. Nov. 5, 2012 order); *In re Heller Ehrman LLP*, Case No. 08-32514 (Bankr. N.D. Cal. Dec. 30, 2008 order); *In re Arriva Pharmaceuticals, Inc.*, Case No. 07-42767 (Bankr. N.D. Cal. Sept. 11, 2007 order).

It is both essential and in the best interests of the Debtor's estate and creditors that the existing Cash Management System be maintained. The Debtor's reorganization efforts will be facilitated by preserving the "business as usual" atmosphere and avoiding the distractions that would inevitably be associated with a substantial disruption in the existing Cash Management System. Accordingly, it is appropriate and entirely consistent with applicable provisions of the Bankruptcy Code for the Court to approve the Debtor's Cash Management System in its current form.

**D.  The Debtor Should Be Granted Authority to Continue Its Accounting Policies and Practices**

The Debtor also seeks authority to continue its accounting policies and practices that allow it to determine with accuracy the amount and location of all funds it holds, and whether such funds are the Debtor's funds or funds held in trust.

It is critical that the Debtor continues to follow its prepetition accounting policies and practices for they allow the Debtor to coordinate transfers between the Bank Accounts efficiently, effectively operate its business, and accurately account for restricted funds and funds held for others. The Debtor's current accounting policies and practices, as well as the vast majority of the

Bank Accounts, are tested and familiar to the Debtor's employees. The Debtor's current accounting policies and practices function well for the Debtor in terms of tracking expenditures, matching cash with cash needs, ease of account record keeping, movement of funds, and accounting of funds held in trust or subject to restrictions. Moreover, each year the Debtor's financial statements are audited by a public accounting firm and the closing of the Debtor's Bank Accounts or any significant switch in accounting policies and practices would unnecessarily complicate that process.

In addition, it would be inefficient and time consuming for the Debtor to establish an entirely new set of accounting policies and practices. Preserving the usual atmosphere and avoiding the unnecessary distractions that would inevitably be associated with any substantial change in accounting policies and practices will facilitate the Debtor's reorganization efforts. The Debtor's accounting policies and practices have resulted in accurate and detailed records of the funds in the Bank Accounts. Forcing the Debtor to close its Bank Accounts or significantly alter its accounting policies and practices could result in confusion over which funds the Debtor is holding are its own property and which are held in trust.

Thus, under the circumstances, allowing the Debtor to maintain its accounting policies and practices is in the best interests of its estate and creditors. The Debtor will continue to maintain strict records with respect to all transfers of cash so that transactions can be readily traced and evaluated.

**E.    Continued Use of Investment Practices**

The Debtor also seeks a waiver of the deposit guidelines set forth in section 345(b) to the extent necessary to allow the Debtor to maintain its Bank Accounts.

Section 345 of the Bankruptcy Code authorizes a debtor to invest cash and money in a manner that will "yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). Section 345(b) of the Bankruptcy Code provides as follows:

> Except with respect to a deposit or investment that is insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States, the trustee shall require from an entity with which such motion is deposited or invested –

(1) a bond –

    (A) in favor of the United States;

    (B) secured by the undertaking of a corporate surety approved by the United States trustee for the district in which the case is pending; and

    (C) conditioned on –

        (i) a proper accounting for all money so deposited or invested and for any return on such money;

        (ii) prompt repayment of such money and return; and

        (iii) faithful performance of duties as a depository; or

(2) the deposit of securities of the kind specified in section 9303 of title 31;

unless the court for cause orders otherwise.

11 U.S.C§. § 345(b).

Section 345 expressly provides that the Court may modify a debtor's investment requirements for "cause." The Debtor submits that cause exists for allowing it to invest its excess cash in accordance with its existing investment policies, without meeting the strict bond requirements of section 345(b).

The Debtor submits that its practices generally conform to the intent of section 345 (b) to protect and maximize the value for its estate. The Debtor believes that its existing investment procedures are designed to protect the principal invested while maximizing liquidity and, therefore, believes that sufficient cause exists to waive the investment requirements of section 345(b) to allow the Debtor to continue its existing investment procedures.

Courts have routinely granted requests to approve the continued use of deposit guidelines that do not comply strictly with section 345. This is especially the case when, as here, the manner of the proposed investments is safe and prudent. *See, e.g., In re Service Merchandise, Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (enumerating factors to be considered in waiving requirements of section 345, including size of business and safety of debtor's proposed investments).

Moreover, the Debtor believes that the banks the Debtor uses are well-established and invest the Debtor's funds in accordance with their standard investment guidelines. Requiring the Debtor

Case: 23-10113    Doc# 5    Filed: 03/13/23    Entered: 03/13/23 11:56:56    Page 25 of 33

to open multiple accounts at different banks so that the deposits in each such bank would be insured by FDIC would be unnecessarily burdensome and would lead to the same delays and disruption of the Debtor's business that this Motion seeks to avoid.

While Catholic Extension and the Catholic Community Foundation ("CCF") are not FDIC insured banking institutions, in the RCBSR's business judgment, the Catholic Extension and the CCF holds sufficient reserves to protect the RCBSR's money and the RCBSR's funds in the accounts at Catholic Extension and CCF are safe based on information provided by them.  In addition, the RCBSR's funds in the CCF are held at Summit State Bank, a depository institution on the U.S. Trustee's approved list of depositories.  The funds at Catholic Extension are held in long-term investments designed to minimize the risk of loss of those funds while providing a return on the funds invested.

The Debtor submits that given the totality of the circumstances its request is reasonable and cause exists for the Court to relieve the Debtor from compliance with the requirements of Bankruptcy Code section 345(b).  For the foregoing reasons, the Debtor believes that granting the relief requested herein is appropriate and in the best interests of its estate.

To the extent the fourteen day stay of Bankruptcy Rule 6004(h) may be construed to apply to the subject matter of this Motion, the Debtor requests that such stay be waived.

## CONCLUSION

Just as the financial reorganization of commercial debtors depends upon their business relationships continuing unimpeded by those reorganizations, it is equally critical to the Debtor that its reorganization case be transparent to the tens of thousands of men and women who daily seek services and solace from the RCBSR and from the parishes, schools, other Non-Debtor Catholic Entities, and charities the RCBSR serves.  Granting the motion will help ensure that the RCBSR can continue its mission.

WHEREFORE, the RCBSR respectfully requests that the Court enter an Order substantially in the form attached hereto as Exhibit A as follows:

1.      Approving the Motion on an expedited basis;

2.      Authorizing the RCBSR to continue to use its existing Cash Management System;

Case: 23-10113   Doc# 5   Filed: 03/13/23   Entered: 03/13/23 11:56:56   Page 26 of 33

3.     Authorizing the RCBSR to maintain and use its existing Bank Accounts, accounting policies and practices and Business Forms;

4.     Waiving Local Rule 2015-1 and UST Guideline 4.4.6 to the extent necessary, as described in the Motion;

5.     Authorizing the RCBSR to continue its investment practices in lieu of the investment requirements of 11 U.S.C. § 345(b);

6.     Granting all other relief described in the Motion; and

7.     Granting such other relief as the Court deems just and proper under the circumstances.

Dated: March 13, 2023

FELDERSTEIN FITZGERALD
WILLOUGHBY PASCUZZI & RIOS LLP

By:_/s/ Paul J. Pascuzzi_
PAUL J. PASCUZZI
Proposed Attorneys for
Debtor and Debtor-In-Possession
The Roman Catholic Bishop of Santa Rosa

MOTION RE CASH MANAGEMENT

# EXHIBIT A

Case: 23-10113   Doc# 5   Filed: 03/13/23   Entered: 03/13/23 11:56:56   Page 28 of 33

1   PAUL J. PASCUZZI, State Bar No. 148810
    JASON E. RIOS, State Bar No. 190086
2   THOMAS R. PHINNEY, State Bar No. 159435
    FELDERSTEIN FITZGERALD
3   WILLOUGHBY PASCUZZI & RIOS LLP
    500 Capitol Mall, Suite 2250
4   Sacramento, CA 95814
    Telephone: (916) 329-7400
5   Facsimile: (916) 329-7435
    ppascuzzi@ffwplaw.com
6   jrios@ffwplaw.com
    tphinney@ffwplaw.com
7
    Proposed Attorneys for
8   The Roman Catholic Bishop of Santa Rosa

9                    UNITED STATES BANKRUPTCY COURT

10                   NORTHERN DISTRICT OF CALIFORNIA

11                          SANTA ROSA DIVISION

12
    In re:                               CASE NO. 23-10113
13
    THE ROMAN CATHOLIC BISHOP OF         Chapter 11
14  SANTA ROSA,                          Date:      March 16, 2023
                                         Time:      1:00 p.m.
15           Debtor In Possession.       Location:  1300 Clay Street, Ctrm. 215
                                                    Oakland, CA
16                                                  [In person or via Zoom]
                                         Judge:     Hon. Charles Novack
17
                                         Order Shortening Time
18

19        INTERIM ORDER (1) AUTHORIZING CONTINUED USE OF EXISTING CASH
          MANAGEMENT SYSTEM, OPERATIONAL BANK ACCOUNTS AND RELATED
20       INVESTMENT ACCOUNTS; (2) EXCUSING COMPLIANCE WITH SECTION 345(b);
          AND (3) AUTHORIZING CONTINUED USE OF CURRENT INVESTMENT POLICY
21

22           The motion of The Roman Catholic Bishop of Santa Rosa ("Debtor"), debtor in possession,

23   seeking entry of an order (1) authorizing continued use of existing cash management system,

24   operational bank accounts and related investment accounts; (2) excusing compliance with section

25   345(b); and (3)authorizing continued use of current investment policy (the "Motion"), came on

26   for hearing on March 16, 2023, at 1:00 p.m., in Courtroom 215 of the United States Bankruptcy

27   Court for the Northern District of California. The Debtor appeared through its counsel, Paul J.

28   Pascuzzi. Other appearances were noted on the record. All capitalized terms used but not defined

herein shall have the meanings given to them in the Motion.

The Court has considered the Motion, the Declaration of Deacon Joe Oberting in Support of Chapter 11 Petition and First Day Motions, the Declaration of Deacon Joe Oberting filed in support of the Motion, the Declaration of Adrienne Moran in Support of Chapter 11 Petition and First Day Motions, and the matters reflected in the record of the hearing held on the Motion on March 16, 2023. The Court having found that it has jurisdiction over this proceeding; that this is a core proceeding; that notice of the Motion has been given to the Office of the United States Trustee, the twenty largest unsecured creditors, all secured creditors, if any, and any applicable governmental entities; that no further notice is necessary; that the relief sought in the Motion is in the best interests of the Debtor, its estate, and its creditors; and that good and sufficient cause exists for such relief.

Accordingly, it is hereby ORDERED as follows:

1.     The Motion (Docket No. __) is GRANTED on an interim basis;

2.     The Debtor is authorized to: (a) designate, maintain, and continue to use any and all existing bank accounts with the same account numbers, including, without limitation, the accounts identified in the Motion, provided however that the accounts shall be designated as debtor in possession accounts to the extent possible by the relevant banks; and (b) continue to use its existing cash management system. In connection with the ongoing utilization of the cash management system, the Debtor shall continue to maintain strict records with respect to all transfers of cash so that all transactions may be readily ascertained, traced, recorded properly, and distinguished between pre-petition and post-petition transactions.

3.     Each of the Debtor's existing depository and disbursement banks (collectively, the "Banks") is authorized to debit the Debtor's accounts in the ordinary course of business without the need for further order of this Court for: (i) all checks drawn on the Debtor's accounts which are cashed at such Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (ii) all checks or other items deposited in one of Debtor's accounts with such Bank prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtor was responsible for

such items prior to the Petition Date; and (iii) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to any Bank as service charges for the maintenance of the Cash Management System.

4. Any of the Debtor's Banks may rely on the representations of the Debtor with respect to whether any check or other payment order drawn or issued by the Debtor prior to the Petition Date should be honored pursuant to this or any other order of this Court without any duty of further inquiry and without liability for following the Debtor's instructions.

5. That (i) those certain existing deposit agreements between the Debtor and its Banks shall continue to govern the post-petition cash management relationship between the Debtor and the Banks, and that all of the provisions of such agreements, including, without limitation, the termination and fee provisions, shall remain in full force and effect, and (ii) the Debtor and the Banks may, without further Order of this Court, agree to and implement changes to the Cash Management System and procedures in the ordinary course of business, including, without limitation, the opening and closing of bank accounts.

6. Nothing contained herein shall prevent the Debtor from opening any additional bank accounts or closing any existing bank account(s) as it may deem necessary and appropriate, and the Banks are authorized to honor the Debtor's request to open or close, as the case may be, such bank accounts or additional bank accounts, *provided however*, that any new account shall be with a bank that is insured with the Federal Deposit Insurance Corporation that is organized under the laws of the United States or any State thereof and that such account is either bonded or securitized as described in 11 U.S.C. § 345(b) should the account exceed the FDIC insurance limit.

7. Any and all accounts opened by the Debtor on or after the Petition Date at any Bank shall, for all purposes under this Order, similarly be subject to the rights and obligations of this Order.

8. The Debtor and the Banks are hereby authorized to continue to perform pursuant to the terms of any pre-petition agreements that may exist between them, except to the extent otherwise directed by the terms of this Order. The parties to such agreements shall continue to enjoy the rights and remedies afforded to them under such agreements, except to the extent

Case: 23-10113   Doc# 5   Filed: 03/13/23   Entered: 03/13/23 11:56:50   Page 31 of 33

ORDER AUTHORIZING CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, ETC.

modified by the terms of this Order or by operation of the Bankruptcy Code.

        9.     The Debtor is authorized to continue to use its existing business forms and stationery without alternation or change.

        10.    The Debtor is authorized to continue its current investment practices as described in the Motion and related pleadings, including but not limited to the use of the Merrill Lynch Stock Transfer Account, the funds on deposit with Catholic Extension and the funds deposited with the Catholic Community Foundation.

        11.    Neither this Order, nor the Debtor's payment of any amounts authorized by this Order, shall: (i) result in any assumption of any executory contract by the Debtor; (ii) result in a commitment to continue any plan, program, or policy of the Debtor; or (iii) impose any administrative, pre-petition, or post-petition liabilities upon the Debtor.

        12.    In granting the Motion, the Court is not making any findings or determinations as to what is or is not property of the estate. Nothing herein constitutes a judicial approval or disapproval, or judicial determination, of what assets are or are not restricted or held in trust or property of the estate or what expenditures are reasonable or appropriate.

        13.    To the extent the fourteen day stay of Bankruptcy Rule 6004(h) may be construed to apply to the subject matter of this Order, such stay is hereby waived.

        14.    Nothing in this Order authorizes the Debtor to make any payments that benefit, directly or indirectly, any credibly accused perpetrator of abuse, whether for wages, support, housing, prepetition claims, retirement or otherwise.

        15.    The Court shall retain jurisdiction to hear and determine all matters arising from implementation of this Order.

        16.    The final hearing on the Motion shall be heard on _____, 2023, at _____ _.m. Opposition, if any, to the granting of the Motion on a final basis shall be filed by _____, 2023. The Debtor's reply to any opposition shall be filed by _____, 2023.

        17.    Counsel to the Debtor is directed to serve a copy of this Order on all parties on the Limited Service List, as defined in the Debtor's Motion For Order Establishing Notice Procedures ///

on file herein, within five (5) days of the entry of this Order and to file a certificate of service with

the Clerk of the Court.

APPROVED AS TO FORM.

OFFICE OF THE UNITED STATES
TRUSTEE

_____
JASON BLUMBERG

* * * END OF ORDER * * *

Case: 23-10113    Doc# 5    Filed: 03/13/23    Entered: 03/13/23 11:56:50    Page 33 of 33