CHRISTINA L. GOEBELSMANN (CA SBN 273379)
Assistant United States Trustee
JASON BLUMBERG (CA SBN 330150)
Trial Attorney
TREVOR R. FEHR (CA SBN 316699)
Trial Attorney
PHILLIP J. SHINE (CA SBN 318840)
Trial Attorney
Office of the United States Trustee
450 Golden Gate Avenue, Room 05-0153
San Francisco, California 94102
Phone: (415) 705-3333
Facsimile: (415) 705-3379
Email: jason.blumberg@usdoj.gov

Attorneys for Tracy Hope Davis,
United States Trustee for Region 17

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SANTA ROSA DIVISION**

| | |
|---|---|
| In re:<br><br>**THE ROMAN CATHOLIC BISHOP OF SANTA ROSA,**<br><br>Debtor and Debtor in Possession. | Bankruptcy Case No. 23-10113 CN<br><br>Chapter 11<br><br>Date: March 16, 2023<br>Time: 1:00 p.m.<br>Place: 1300 Clay Street, Ctrm 215<br>Oakland, CA<br>[In Person or via Zoom] |

**UNITED STATES TRUSTEE'S OMNIBUS OBJECTION TO DEBTOR'S FIRST DAY MOTIONS [ECF Nos. 5, 6, & 8] AND RESERVATION OF RIGHTS**

1. Tracy Hope Davis, United States Trustee for Region 17 (the "UST"), hereby files this omnibus objection (the "Omnibus Objection") to three first-day motions filed in this case. These first day motions are referred to collectively hereafter as the "First Day Motions", or individually, as set forth below:

- *Motion for Order (1) Authorizing Continued Use of Existing Cash Management System, Operational Bank Accounts and Related Investment Accounts; (2) Excusing Compliance with Section 345(b); and (3) Authorizing*

1

- *Continued Use of Current Investment Policy* (ECF No. 5) (the "Cash Management Motion");

- *Motion for Order (1) Authorizing Payment of Prepetition Wages, Salaries and Employee Expenses; (2) to Pay Accrued Employee Benefits and Taxes; and (3) Directing Banks to Honor Payroll and Expense Checks* (ECF No. 6) (the "Wages Motion"); and

- *Debtor's Motion to Establish Notice Procedures and to File Confidential Information Under Seal* (ECF No. 8) (the "Notice Procedures Motion").[1]

2. This Omnibus Objection is supported by the following memorandum of points and authorities and any argument the Court may permit on the Omnibus Objection.[2]

## I. MEMORANDUM OF POINTS AND AUTHORITIES

### A. Introduction

3. The Debtor's requests for relief in the First Day Motions should be: (a) denied; (b) denied in part; or (c) limited to only emergency relief to permit the Debtor to sustain business operations. The UST is scheduling the initial debtor interview. The meeting of creditors pursuant to 11 U.S.C. § 341 will be held on April 18, 2023. The United States Trustee is in the process of soliciting creditors for the purpose of forming an official committee of unsecured creditors. In the best interest of creditors, the Court should either sustain this Omnibus Objection

---

[1] The UST has provided comments to the Debtor's counsel with respect to two other "First Day Motions": (i) the Debtor's application to appoint Donlin, Recano & Company, Inc. as claims and noticing agent, (ECF No. 9) (the "Donlin Recano Application"); and (ii) the Debtor's motion regarding utility services under 11 U.S.C. §366, (ECF No. 7) (the "Utilities Motion"). The UST takes no position on the Donlin Recano Application or the Utilities Motion at this time, but reserves all rights to object to any final relief sought by the Debtor in these motions.

[2] The UST requests that the Court take judicial notice of the pleadings and documents filed in these cases pursuant to Federal Rule of Bankruptcy Procedure 9017 and Federal Rule of Evidence 201. To the extent that the Omnibus Objection contains factual assertions predicated upon statements made by the Debtor, any of its current or former affiliates, agents, attorneys, professionals, officers, directors or employees, the UST submits that such factual assertions are supported by admissible evidence in the form of admissions of a party opponent under Federal Rule of Bankruptcy Procedure 9017 and Federal Rule of Evidence 801(d)(2).

or adjourn the hearing on these First Day Motions to a later date to allow any creditors committee or other creditors a meaningful opportunity to evaluate these First Day Motions.

4. The UST reserves all rights with respect to all of the Debtor's First Day Motions which are scheduled for hearing on the above-captioned date and time, including, but not limited to her right to take any appropriate action under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the U.S. Bankruptcy Court for Northern District of California.

**B.      Background Facts and Procedural Posture**

5. On March 13, 2023 (the "Petition Date"), the Debtor commenced a voluntary case under Chapter 11 of the United States Bankruptcy Code. *See* ECF No. 1 (Case No. 23-30113). The Debtor is currently a debtor-in-possession under sections 1107 and 1108 of the Bankruptcy Code.

6. On the Petition Date, the Debtor filed its list of 20 largest unsecured creditors. *See* ECF No. 1

7. The Debtor has not yet filed the required Schedules and Statements, including Schedule A/B, Schedule D, Schedule E/F and the Statement of Financial Affairs. *See* Bankruptcy Docket, *generally*.

8. The UST is in the process of scheduling the Initial Debtor Interview.

9. The United States Trustee is in the process of soliciting creditors for the purpose of forming an official committee of unsecured creditors.

10. The section 341 meeting of creditors will take place on April 18, 2023.

11. According to the first day declaration of Deacon Joe Oberting (ECF No. 13), the Debtor "was created from portions of the Sacramento Diocese and San Francisco Archdiocese in

1962, and now includes 42 parishes some of which have missions associated with them." *See* Oberting Declaration, at ¶ 5. Pursuant to various service agreements, the Debtor provides services to the parishes, including "appointment of priests and permanent deacons [and] maintain[ing] the remuneration policy for priests (including retirement plans and health insurance plan), while the parishes pay for these items organized and administered" by the Debtor. *Id.*, at ¶ 19.

12. Upon information and belief, the Debtor filed for bankruptcy as a result of approximately 207 pending lawsuits alleging abuse. *See* Oberting Declaration, at ¶¶ 20, 30, 34. The lawsuits are being jointly administered in a coordinated proceeding in Alameda Superior Court. *See* first day declaration of Adrienne Moran (ECF No. 12) (the "Moran Declaration"), at ¶¶ 2, 8.

## II. ARGUMENT

13. Four principles for Courts to consider with regard to first day motions are:

> First, the requested relief should be limited to that which is minimally necessary to maintain the existence of the debtor, until such time as the debtor can affect appropriate notice to creditors and parties in interest. In particular, a first day order should avoid substantive rulings that irrevocably determine the rights of parties.
>
> Second, first day orders must maintain a level of clarity and simplicity sufficient to allow reasonable confidence that an order will effect no unanticipated or untoward consequences.
>
> Third, first day orders are not a device to change the procedural and substantive rights that the Bankruptcy Code and Rules have established. In particular, first day orders should provide no substitute for the procedural and substantive protections of the plan confirmation process.
>
> Fourth, no first day order should violate or disregard the substantive rights of parties, in ways not expressly authorized by the Bankruptcy Code.

4

*See In re The Colad Group, Inc.*, 324 B.R. 208, 213-14 (Bankr. W.D.N.Y. 2005).

14. Accordingly, the relief sought in the First Day Motions, if granted at all, should be granted only on an interim basis, with a final hearing set so that an Official Committee of Unsecured Creditors, if one can be formed, can review and respond to the final relief sought, preferably after schedules are filed and a meeting of creditors is held.

A. **The Cash Management Motion**

15. In the Cash Management Motion, the Debtor seeks authorization to (i) continue to use its existing cash management system, (ii) continue to use its pre-petition accounts and business forms, and (iii) continue its investment policies without posting bonds pursuant to 11 U.S.C. § 345(b). *See* Cash Management Motion, at ¶ 3.

16. Bankruptcy Code Section 345(b) protects creditors against the loss of estate funds deposited or invested by debtors. *Cf. In re Columbia Gas Systems Inc.*, 33 F.3d 294, 301 (3d Cir. 1994) ("Ensuring the safety of the bankruptcy funds has been the foremost goal.").

17. Specifically, Section 345(b) provides that money of the estate shall be insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States. Money of the estate may also be deposited in an entity that has posted a bond in favor of the United States or has deposited securities with the Federal Reserve Bank.

18. A court may waive the requirements of Section 345 upon a showing of "cause." *See* 11 U.S.C. § 345(b). Thus, the Court may modify the requirements of Section 345(b) for "'just cause' where strict compliance might 'work to *needlessly handcuff* larger, more sophisticated debtors.'" *See In re Ditech Holding Corp.*, 605 B.R. 10, 22 (Bankr. S.D.N.Y. 2019) (emphasis added).

5

19. In order to ensure compliance with Section 345(b), the UST has implemented guidelines for debtors in possession regarding bank accounts (the "UST Guidelines"). Among other things, the UST Guidelines require debtors in possession to close their pre-petition bank accounts and provide proof of the establishment of debtor in possession account(s) at an authorized depositary. *See United States Trustee Chapter 11 Operating and Reporting Guidelines for Debtors in Possession* (Region 17), at § 3, available at https://www.justice.gov/ust-regions-r17/region-17-general-information#ch11.[3]

20. Authorized depositories have agreed to maintain collateral, unless an order of the bankruptcy court provides otherwise, in an amount of no less than 115 percent of the aggregate bankruptcy funds on deposit in each bankruptcy estate that exceeds the FDIC insurance limit. *See* United States Trustee Program Policy and Practices Manual, Volume 7, "Banking and Bonding," (the "UST Manual"), §§ 7-1.1 and 7-1.2.1, at pp. 1-2, available at https://www.justice.gov/ust/united-states-trustee-program-policy-and-practices-manual. Authorized depositories have also agreed to make periodic reports so that the UST can monitor compliance. *See* UST Manual, § 7-1.3.2, at p. 5.

21. Here, according to *Exhibit A* to the Declaration of Deacon Joe Oberting, the Debtor maintains twenty-two bank and investment accounts. *See* ECF No. 5-1, at p. 16 of 25 ("Exhibit A"). Specifically, the Debtor holds:

- twelve (12) accounts at Wells Fargo Bank;

---

[3] The UST is mindful that some courts have concluded that guidelines established by the UST do not have the force and effect of law. *See, e.g., In re Young*, 205 B.R. 894, 897 (Bankr. W.D. Tenn. 1997); *In re Lani Bird, Inc.*, 113 B.R. 672, 673 (Bankr. D. Hawaii 1990); *In re Gold Standard Baking, Inc.*, 179 B.R. 98, 105-06 (Bankr. N.D. Ill. 1995); *In re Johnson*, 106 B.R. 623, 624-25 (Bankr. D. Neb. 1989). As a result, "if the court is to require debtors to comply with particular provisions of the U.S.T.'s Guidelines, it must be for a reason independent of the Guidelines themselves." *Johnson*, 106 B.R. at 624.

- one (1) account at West America Bank;
- three (3) accounts in Summit State Bank;
- one (1) account at U.S. Bank for a "Bishop Retirement SERP";
- one (1) account at Merrill Lynch to monetize donated stock;
- one (1) account at PNC Financial Services Group, Inc. ("PNC Financial Services") as a "Self-Insurance Investment Account";
- an investment with the Mission Diocese Fund, LLC (the "Mission Diocese Fund"); and
- an investment with the Catholic Community Foundation ("CCF"). The funds with CCF are "held in trust for the benefit of parishes, schools and various CCF funded programs" at two accounts at Summit State Bank.

*Id.*; Cash Management Motion, at ¶¶ 13, 17-53.[4]

22. According to the Cash Management Motion, the accounts "contain property of the estate and property administered for others under the various Services Agreements or held in trust for others, which is not property of the estate." *See* Cash Management Motion, at ¶ 15. Further, "many of the funds in the Bank Accounts are subject to charitable restrictions and constitute restricted funds, which are not available to creditors of the estate." *Id.*

23. The Cash Management Motion does not comprehensively address the respective balances in the Debtor's accounts, though it appears the value of the Debtor's investment with the Mission Diocese Fund is at approximately $1,000,000, the balance in Wells Fargo #7582 is generally less than $250,000, and the balance in Summit State Bank #1951 is $1,000. *See* Cash Management Motion, at ¶¶ 14, 18, 50.

---

[4] Although not specifically identified on the Debtor's Exhibit A, it appears that the Debtor also has account(s) at PNC Bank for a "frozen" defined benefit lay pension plan. *See* Cash Management Motion, at ¶¶ 42, 47.

24. Wells Fargo, West America Bank, Summit State Bank, and U.S. Bank are authorized depositories in the Northern District of California. *See* https://www.justice.gov/ust-regions-r17/region-17-general-information#ch11.[5]

25. The UST objects to the Cash Management Motion and the entry of a final order waiving the requirements of Section 345 because the Debtor has failed to provide evidence that supports a finding that cause exists for the waiver of the requirements of Section 345(b). The Debtor has provided insufficient information regarding the funds held in the Debtor's accounts, including the balance of each account and the underlying holdings in the investment accounts. Although the Debtor asserts that its funds are "safe" (Cash Management Motion, at pp. 25-26 of 33), the Debtor's self-serving conclusion is not sufficient to establish cause under Section 345.

26. While the Debtor suggests that funds in one or more of the accounts may or may not be property of the estate, the overriding concern of the UST is that, should a failure contemplated by Section 345 occur resulting in the loss of funds in the accounts, the Debtor would still remain liable. In contrast, by virtue of the collateralization and reporting requirements imposed on authorized depositories, compliance with the UST Guidelines will ensure compliance with the requirements of 11 U.S.C. § 345(b). These requirements would not "needlessly handcuff" the Debtor, but rather protect estate funds as Congress envisioned. *Cf. In re Ditech Holding Corp.*, 605 B.R. at 22 (requiring debtors to bring accounts into compliance with Section 345(b)).

---

[5] As discussed above, the Debtor has an account at PNC Financial Services. PNC Financial Services is not an authorized depository in the Northern District of California, though PNC Bank is an authorized depository. *See* https://www.justice.gov/ust-regions-r17/region-17-general-information#ch11.

27. To the extent the Court is inclined to approve the Cash Management Motion, such approval should be on an interim basis only and such relief should be limited to the accounts specially identified on the Debtor's Exhibit A.[6]  Moreover, the interim Order should (i) require the Debtor to have its accounts at Wells Fargo, West America Bank, Summit State Bank, and U.S. Bank designated as "Debtor-in-Possession" accounts by the institutions within 15 days of entry of the Interim Order, (ii) provide proof to the UST that the accounts have been converted to "Debtor-in-Possession" accounts no later than the final hearing on the First Day Motions; (iii) require the Debtor to institute a system to regularly "sweep" the funds from its accounts at Merrill Lynch and PNC Financial Services into a debtor in possession account at an authorized depository; and (iv) prohibit the Debtor from opening new accounts unless such accounts are debtor in possession accounts at authorized depositories in the Northern District of California.[7]

**B.     The Wages Motion**

28. As set forth in the Wages Motion, the Debtor employs 25 salaried employees and 6 hourly employees. *See* Wages Motion, at ¶ 5.  The Debtor seeks authority to pay "under $15,000 in accrued and unpaid pre-petition payroll" and to honor approximately $42,000 in accrued vacation time entitled to priority (to be paid in the future as such time is taken).  *Id*.  The Debtor seeks authority to pay only such amounts that are entitled to priority status up to $15,150 pursuant to 11 U.S.C. § 507(a)(4) and (5) for each employee.  *Id.* at ¶¶ 4, 36.

---

[6]     Paragraph 2 of the proposed Order indicates that the requested relief is not limited to the accounts specifically identified in the Cash Management Motion.  *See* ECF No. 5, at p. 30 of 33 ("The Debtor is authorized to … maintain … any and all existing bank accounts … including, without limitation, the accounts identified in the Motion ….").

[7]     Paragraph 6 of the proposed Order appears to provide broader authority to open new accounts.  *See* ECF No. 5, at p. 31 of 33

9

29. The Debtor also seeks to pay "business-related" expenses which include car, hotel stay, meals, parking, and other travel expenses and business related costs. *Id.* at ¶ 48. The Debtor does not believe that there are any outstanding pre-petition business expenses. *Id.*

30. The UST takes no position on the payment of (i) pre-petition claims of the Debtor's non-insider employees that are entitled to priority under Sections 507(a)(4) and 507(a)(5), or (ii) the related payroll taxes, deductions and withholdings, provided these amounts do not exceed the statutory cap.

31. However, the UST opposes any payments on claims that are not entitled to priority status (including reimbursement of pre-petition business expenses) or that do not comply with 11 U.S.C. § 503(c)(1) and (3). *See, e.g., In re EcoSmart, Inc.*, 2015 WL 9274245, at *9 (Bankr. C.D. Cal. Dec. 18, 2015) ("[A]bsent the priority status of claims, the courts have not seen justification to allow payment of prepetition claims of so-called 'critical vendors,' and this court will follow such examples and require Debtor to demonstrate that the priority status of wage, salary and commission claims of its employees and independent contractors … to warrant immediate payment in advance of general distribution on prepetition claims.").

32. Paragraph 9 of the proposed interim order states that the Debtor will provide the UST with "a list of Employees to be paid under this Order including accrual dates and amounts to be paid to each Employee." *See* ECF No. 6, p. 29 of 30. This list should be filed on the docket and include the titles of the paid employees. *Cf. In re Motors Liquidation Co.*, 561 B.R. 36, 38 n.1 (Bankr. S.D.N.Y. 2016) ("[P]rivate parties rarely if ever object to another party's sealing motion. The Court and the United States Trustee have generally been vigilant in protecting the public interest in public access to court records.").

33. Additionally, the Wages Motion states that the Debtor "does not make any payments that benefit, directly or indirectly, any *credibly* accused perpetrator of abuse, whether for wages, support, housing, prepetition claims, retirement, or otherwise." *See* Wages Motion, ¶ 12.[8] Given the sensitivities, consideration of payments to persons who have been accused of abuse should be deferred until a final hearing on notice to parties in interest. *See*, *e.g.*, *In re The Diocese of Rochester*, Case No. 19-20905 (Bankr. W.D.N.Y. Sept. 19, 2019) (Order entered as ECF No. 42, at ¶ 3).

C. **The Notice Procedures Motion**

34. As part of the Notice Procedures Motion, the Debtor requests permission "to file the schedules, any other pleadings and proofs of service to the extent they contain non-public names of abuse claimants and potential abuse claimants under seal." *See* Notice Procedures Motion, at p. 2 of 16.

35. Bankruptcy Code Section 107(a) "evidences congress's strong desire to preserve the public's right of access to judicial records in bankruptcy proceedings." *See In re Orion Pictures Corp.*, 21 F.3d 24, 26 (2d Cir. 1994); *see also In re Roman Catholic Archbishop of Portland in Oregon*, 661 F.3d 417, 429 (9th Cir. 2011) (Section 107(a) "establishes a general right of public access to bankruptcy filings.").

36. Under the circumstances of this case, the UST does not oppose the Debtor's request to file the names of survivors under seal. Consistent with 11 U.S.C. § 107(c), however, the Debtor should be required to provide copies of sealed portions of any documents to the UST so that the UST may discharge her statutory duties, including the solicitation and appointment of any committees under 11 U.S.C. § 1102. *See* 11 U.S.C. § 107(c)(3); *In re One Jet, Inc.*, 630

---

[8] It appears that there may be one claim against an active cleric that the Debtor believes is not credible. *See* Moran Declaration, at ¶ 17.

B.R. 761, 764 (Bankr. W.D. Pa. 2021) ("[E]ven if successful, the United States Trustee and any chapter trustee are statutorily guaranteed full access to all information contained in the [sealed] paper.").

37. As part of the Notice Procedures Motion, the Debtor also seeks authority to limit notice with respect to "all matters covered by Bankruptcy Rule 2002." *See* Notice Procedures Motion, at ¶ 4. The Debtor proposes that these notices instead be sent only to a "Limited Service List." *Id.*

38. Notice would not be so limited with respect to the following matters: (i) the first meeting of creditors; (ii) the time fixed for filing proofs of claim; (iii) objection deadlines and hearings with respect to approval of disclosure statements and plan confirmation; and (iv) notice and transmittal of ballots for accepting or rejecting a plan of reorganization. *See* Notice Procedures Motion, at ¶ 4; *see also* Fed. R. Bankr. P. 2002(a)(1), (7), 2002(b), and 3017(d).

39. Federal Bankruptcy Rule 2002(a) identifies a number of notices that must be served on all creditors. *See* Fed. R. Bankr. P. 2002(a); *In re SoCalDeal, Inc.*, 2021 WL 3702206, at *1 (Bankr. C.D. Cal. Aug. 19, 2021) ("Federal Rule of Bankruptcy Procedure 2002(a)(3) requires 21 days notice to all creditors ….").

40. The Debtor cites Federal Bankruptcy Rule 2002(i) as support for its request to limit notice. That provision permits limited notice of the matters identified in Federal Bankruptcy Rules 2002(a)(2), 2002(a)(3) and 2002(a)(6) upon appointment of an official committee of unsecured creditors. *See In re Monument Rec. Corp.*, 71 B.R. 853, 863 (Bankr. M.D. Tenn. 1987) ("Notice to the committee pursuant to Bankruptcy Rule 2002(i) may satisfy the notice to creditors requirement imposed by various sections of the Code."). Federal

Bankruptcy Rule 2002(i) does not address or authorize limited notice of the matters specified in Federal Bankruptcy Rules 2002(a)(4) and 2002(a)(5).

41. Accordingly, the proposed notice procedures should be amended to expressly provide that notices under Federal Bankruptcy Rules 2002(a)(2), (3), and (6) shall be served on all creditors, at least until the UST appoints an official committee of unsecured creditors. *See* Fed. R. Bankr. P. 2002(a), (i). Further, the Debtor's request to limit notice for the matters specified in Federal Bankruptcy Rules 2002(a)(4) and 2002(a)(5) should be denied.

42. Finally, the Notice Procedures Motion requests authorization for electronic service. *See* Notice Procedures Motion, at ¶¶ 6-7. The proposed notice procedures should be amended to provide that complaints, summons, and contested matters must be served on parties directly affected by the pleading or proceeding in the manner prescribed by Federal Bankruptcy Rules 7004 and 9014(b), unless such party expressly consents to electronic service.

### III. CONCLUSION

43. In view of the shortened notice provided to creditors and the Debtor's failure to establish a sufficient evidentiary record for the relief sought, the objected to First Day Motions should either be denied in the entirety, denied in part as set forth herein, or any relief granted should be limited for the Debtor to sustain operations and to provide adequate protection, if any. Alternatively, the First Day Motions should be adjourned until a later date. The adjournment would permit parties that were not provided sufficient notice and any committee the opportunity to be heard on the First Day Motions. The UST reserves all her rights with respect to the First Day Motions and other motions filed on the Petition Date.

**WHEREFORE**, the UST requests the Court to sustain her Omnibus Objection; and grant such other relief as is just under the circumstances.

Dated: March 15, 2023

TRACY HOPE DAVIS
UNITED STATES TRUSTEE

By: /s/ Jason Blumberg
Jason Blumberg
Trial Attorney for the United States Trustee